Martin ASHMAN, Appellant,

v.

William G. SMITH et al., Appellees.

No. 14493.

Court of Civil Appeals of Texas.

Houston.

March 25, 1965.

Rehearing Denied April 29, 1965.

3. Whether his having driven into the intersection when the traffic control signal facing him showed a red light was negligence.

4. Whether he failed to make an effort to avoid the collision by turning his vehicle.

5. Whether he failed to keep a proper lookout.

Too, the court submitted discovered peril and the jury found that Smith did not discover appellant's perilous position in such time as to be able to avoid the collision. The jury also found Smith was acting in an emergency and in such emergency acted prudently.

Appellant for reversal asserts that the jury's answers to each of the above issues are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong. In passing on whether this is true of the jury's answers, we must review all of the evidence. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

McClure & Lucas, Houston, and Harold Lloyd, Houston, of counsel, for appellant.

Talbert, Giessel, Cutherell, Barnett & Stone, Thomas W. Foster, Houston, for appellees.

BELL, Chief Justice.

Appellant sued William G. Smith and Zero Refrigerated Lines, for whom Smith was driving a truck, to recover damages resulting from injuries received in an automobile collision. A jury acquitted Smith of any negligence, acquitted appellant of contributory negligence, and found the collision was the result of an unavoidable accident. Judgment on the verdict was that appellant take nothing.

The court submitted the following issues inquiring of negligence on the part of Smith:

1. Whether he was driving at an excessive rate of speed.

2. Whether he failed to make timely application of brakes.

The evidentiary facts are largely undisputed. The problem arises over the inferences to be drawn from them.

The collision occurred on September 15, 1962, at the intersection of McCarty Drive and a service road on the west side of what is known as North Loop, an interstate highway skirting the City of Houston. At this time the North Loop was being constructed. It was not, at the intersection with McCarty, in use. The service road was in use for traffic going north and south. The service road was 27 feet in width. There was a service road on the east side of the North Loop, but it was not in use and was closed to traffic. McCarty Drive at the intersection runs east and west. It is a four-lane highway. North Loop crosses over McCarty on an overpass (we sometimes refer to it as an underpass). The width of the overpass from east to west is not shown, but testimony is that the North Loop was designed to carry three

lanes of traffic each way. McCarty intersects the service road at a right angle. Suspended above and at the center of the intersection was a traffic control signal. Its height above the street is not shown. The streets at the intersection and for a long distance on either side are straight and level.

Appellant, just before the collision, was driving his automobile south on the service road at about 11 p. m. When he reached the intersection with McCarty the traffic control signal facing him was red. He stopped to await a change in the signal to green. As the signal changed to green, appellant slowly moved forward and the truck driven by Smith ran into the left side of appellant's automobile, causing substantial damage to the car and causing personal injury to appellant. It is undisputed that Smith ran a red light. Smith was driving a refrigerated truck. The truck consisted of a tractor and trailer. The over-all length was 50 feet. He had a load of about 35,000 pounds of frozen sweet potatoes. The vehicle with its load weighed about 70,000 pounds. There were 18 wheels on the tractor and trailer. The air brakes, when applied, would take effect on 16 wheels—all except the two front wheels. He was driving west on McCarty. The established speed limit was 45 miles per hour. There is some evidence, but of an indefinite nature, that there was some construction going on along the shoulders to McCarty. There is no evidence of probative force, however, that the speed limit of 45 miles per hour had been reduced because of the construction.

Mr. Smith testified that as he was proceeding west along McCarty and was at a point about 300 or 350 feet from the overpass, he noticed a sign reading "Signals Ahead". About that time he looked up ahead and saw the traffic signal west of the overpass change from red to green. It is here to be noted that at one point he testified he didn't recall whether he saw the change take place at the 300 to 350 foot point but it was about at that point.

Whether he observed the light again before reaching the western edge of the overpass does not appear in the record. At what distance from the east side of the underpass the light would become obscured is not shown, but it would because of the overpass be hidden for a time from the traveler. When he learned from the sign that signals were ahead, he reduced his speed to 30 miles per hour, which speed he maintained until he tried to stop the truck as his truck came out of the underpass on the west side. He, having seen the change of the signal light to green as it faced him, felt he had plenty of time to proceed through the signal before it turned red. He based this conclusion on his familiarity with the timing of signal lights generally. There is no evidence of what such timing generally is. There is evidence that this light was set so the green color would remain 20 seconds and the amber 5 seconds. There is no evidence that Smith knew of this timing. Smith had been over this route only once and it was about a year before the collision. He was in the lane next to the center line of McCarty. Just as he was coming out of the underpass he noticed the signal light had changed to red. He also saw appellant's car proceeding into the intersection. He threw on his brakes but could not stop in time to avoid the collision. He stated he was probably going 15 or 20 miles per hour at the point of impact. Forty feet of skid marks were left by the truck. He testified he could stop the truck in something just over 100 feet. It does not appear whether this distance included perception and reaction time. We rather doubt that it does.

The investigating officer testified that 20 feet of the skid marks were east of the east curb line of the service road and 20 feet were west. The point of impact was stated to have been from three to seven feet in the west half of the service road. While at one place the officer testified 20 feet of the skid marks were west of the east curb line and at another from three to seven feet in the west lane of the serv-

ice road, this would be inaccurate because the two front wheels of the tractor would not skid. How far it was from these wheels to the first wheels that would skid, because of the application of the brakes, we do not know. He also testified he stopped a truck of the same kind as Smith's and made a test to see at what point under the underpass he could see the signal light. He stood on the running board on the driver's side; put his head at the height of the driver's head; had the driver ease forward until the witness could first see the light; and, then had him stop. He then measured and it was 147 feet east of the east curb line. It was 70 feet from the west edge of the underpass to the light, according to estimate. Whether he stood at a point back of the front of the cab at a distance the driver would sit does not appear. Of course, a driver will have some roof of the cab above and in front of him that can make some difference in the point at which he can see the overhead light.

One witness who was sitting in an automobile back of appellant awaiting the change of lights estimated the truck was going 40 to 50 miles per hour. He could, because of the embankment under the overpass, have gotten only a fleeting glimpse of the truck. We give little weight to this estimate. The officer, basing his testimony on the skid marks, testified Smith was not speeding (apparently meaning not exceeding the posted speed limit of 45 miles per hour).

It appears that on August 2, 1962, some step-down plastic strips were replaced at the light. The maintenance record shows the maintenance man noted "okay on departure." On November 5, 1962, a complaint was received that the light was stacking up traffic. The maintenance record reflects an inspection was made and the notation on the record states the "face was holding maximum."

■ We have reached the conclusion that we cannot say in the light of the whole record that the answers of the jury are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. We, had we been jurors, might have reached a different result, but as a reviewing court we may not merely substitute our views for those of a jury. Before we can disturb the jury's answers, we must be able to say they are so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong.

■■ The mere fact that a statute was violated by Smith in running the red light does not mean he was guilty of negligence. There are instances where a violation of a statute is excused. Whether this is true depends on the fact of each case. If a party is unable to avoid a violation and has not wrongfully placed himself in a position that brings such inability about, he is excused insofar as civil liability is concerned. Phoenix Refining Co. v. Powell, Tex.Civ. App., 251 S.W.2d 892, n. r. e.; Taber v. Smith, Tex.Civ.App., 26 S.W.2d 722, no writ hist.; Cunningham v. Suggs, Tex. Civ.App., 340 S.D.2d 369, ref., n. r. e.; Spurlock v. Burnette, Tex.Civ.App., 365 S.W.2d 812, no writ hist. If of course Smith's negligence placed him in the position where he could not avoid running the red light, then he is not excused.

■ It is also true that if Smith's negligence was the proximate cause of placing him in an emergency situation, he cannot in law be said to be acting in a sudden emergency.

There is little doubt in our minds that the record shows that Smith, after discovering the light was red, did all he could to avoid the collision.

Smith was traveling on a highway that was level and straight where the speed limit was 45 miles per hour. While there was some construction work being done, it does not appear it was on the roadway itself. It does not appear that anyone was actually working on the road that night and we certainly know that normal construction work is not carried on at night.

The night was clear. There is no evidence of any wet surface. The topping was asphalt. Upon being about 350 feet from the light, Smith saw the signs saying "Signals Ahead". He immediately reduced his speed to 30 miles per hour. About the same time he noticed the signal light turned to green. If his distance estimate had been correct, he would have cleared the light before it changed. In retrospect we know his distance estimate was incorrect, but it was not far off because one can infer from the record that the signal changed while he was under the underpass. A jury could well reason that if he looked at the light before going under the underpass, it would still have been green. We cannot say that under the circumstances above stated in a recitation of the evidence, that the answer that he was not driving at an excessive speed was clearly wrong, nor was the answer that he did not fail to keep a proper lookout.

Appellant complains that Smith did not timely apply his brakes because the evidence shows that an officer made some tests and the light could be seen 147 feet east of the east curb line. He then reasons that the collision took place 167 feet west from the point the light could first be seen. It is to be remembered that this experiment was made under ideal conditions of a vehicle moving very slowly and the officer being interested at the moment solely in discovering the light. Too, we have observed he was on the outside of the cab. Appellee testified he saw the light as he was coming out of the underpass. There is evidence that the west edge of the underpass was 70 feet from the light. There were 40 feet of skid marks. However, in determining when the brakes should have been applied, we must take into consideration perception and reaction time. Traveling at 30 miles per hour the truck would have been traveling at 44 feet per second. The average perception time would be $\frac{3}{4}$th of a second, as would reaction time. After discovering the red light, Smith would have traveled about 66 feet before the brakes would take effect. While appellant says he traveled 120 feet before applying the brakes, this is based only on the conclusion that Smith discovered the light 147 feet east of the east curb line and does not take into consideration perception and reaction time. Even if Smith discovered the light at such point, a jury could reach the conclusion, taking into consideration those two time elements, that Smith could not stop because the only testimony shows it takes something over 100 feet to stop the truck. However, a jury could well conclude a reasonably prudent person situated as was Smith would not discover the light at the 147 foot point.

We think clearly the evidence establishes Smith could not, with any degree of effectiveness, turn the vehicle and avoid the collision.

Affirmed.